(No. 6650—■■■■■■)

EDITH HANSEN; RICHARD G. HANSEN, individually; MERRILL HANSEN, ARTHUR HANSEN, CORRINE HANSEN, ELAINE HANSEN AND MAREN HANSEN, minors, by RICHARD G. HANSEN, their father and best friend, Claimant, *vs.* STATE OF ILLINOIS, DEPARTMENT OF TRANSPORTATION, Respondent.

*Opinion filed June 16, 1975.*

BOZEMAN, NEIGHBOUR, PATTON & NOE, Attorney for Claimants.

WILLIAM J. SCOTT, Attorney General; HOWARD W. FELDMAN, Assistant Attorney General, for Respondent.

PERLIN, C. J.

Edith Hansen, her husband, Richard Hansen, and their five minor children have brought this action to recover for injuries which each sustained in an automobile accident on April 11, 1971. The accident occurred on

Illinois Interstate 80 at its intersection with Interstate 280 and Interstate 74 in Henry County, Illinois. Claimants contend that their injuries were proximately caused by the negligence of respondent in designing the portion of Interstate 80 whereon the accident occurred, and respondent's further negligent failure to provide proper signs in the area.

The accident occurred at about 6:50 a.m. on April 11, 1971, a clear, dry day. The Hansen family was returning to their home in Cleveland, Ohio, from a skiing trip in Utah. They had left Utah about 10:00 a.m. on Saturday, April 10, 1971, and had driven continuously with Mr. and Mrs. Hansen alternating behind the wheel. At the time of the accident, Mrs. Hansen was driving the family's 1970 Ford station wagon, having taken over the driving from her husband about 45 minutes earlier. The station wagon was equipped with a mattress in the rear, which permitted the person not driving to sleep.

Mrs. Hansen had not previously driven over the portion of highway in question. The family had taken the same route on returning from their skiing vacation the year before, but Mr. Hansen had then been driving when they reached the junction of Interstate 80, Interstate 280 and Interstate 74.

The junction had been designed in 1958 and approved by the Illinois Department of Public Works in 1959. Construction of the junction itself was completed by the Illinois Department of Public Works in October, 1968.

Eastbound traffic on Interstate 80 changes direction at the junction in that an eastbound motorist on Interstate 80 at the junction has actually been proceeding in a southerly direction from the Iowa-Illinois border and

resumes an easterly path at the interchange by traversing a cloverleaf ramp to his right.

The Hansens were negotiating this cloverleaf ramp on the morning of April 11, 1971, when their vehicle overturned. Mrs. Hansen received permanently crippling injuries in the accident, while the other members of the family fortunately received much less serious injuries.

It was admitted by respondent that a total of 16 accidents on the curve of Interstate 80 at the junction of Interstate 80 and Interstate 280 were reported to the State of Illinois from October, 1968, through April, 1971.

Photographs and diagrams introduced into evidence by claimants and respondent clearly illustrate both the configuration of Interstate 80 at the point of the accident, and the signs that were placed along the highway advising motorists of the existence of the cloverleaf ramp for eastbound traffic. The speed limit on Interstate 80 west of the intersection was 70 miles per hour. Claimants' Exhibit One is a photograph of eastbound Interstate 80 at a point 4,750 feet west of the cloverleaf ramp and shows overhead signs indicating that eastbound traffic for Interstate 80 should utilize the right lane of the two lane highway, and that eastbound traffic for Interstate 74 should utilize the left hand lane. Mrs. Hansen testified that she was in the right hand lane when she approached this set of signs, and that she noted that the right hand lane was the proper lane for Interstate 80 traffic.

Claimants' Exhibit Three is a photograph of eastbound Interstate 80 at a point 2,100 feet from the cloverleaf. Overhead signs at this point direct eastbound traffic on Interstate 80 to use the right lane and indicate a junction one third of a mile ahead for Interstate 80 traffic. A diagramatic sign posted on the right shoulder of

the highway just beyond the overhead signs, bears a diagram of the cloverleaf ahead for eastbound traffic on Interstate 80 and the words, "Next Right." Mrs. Hansen testified that as she passed this point she had moved into the left lane, because there was a large tractor-trailer in the right lane. She said that she saw the signs depicted in claimants' Exhibit Three and dropped her speed to 60 miles per hour.

Claimants' Exhibit Four was a photograph of eastbound Interstate 80 taken from a point 1,600 feet from the cloverleaf showing another diagramatic sign on the right shoulder of the road containing a diagram of the cloverleaf ahead for eastbound Interstate 80 traffic and bearing the words, "Next Right." Mrs. Hansen testified that she did not see this sign because she was passing the tractor-trailer truck in the right lane, and the truck obliterated her view of the sign.

Claimants' Exhibit Five was a photograph of eastbound Interstate 80 at a point 1,050 feet from the cloverleaf and shows a sign on the right shoulder of the roadway stating, "Interstate 80 East, Joliet, Chicago, Next Right." Mrs. Hansen testified that she was unsure whether she had seen this sign, as she may still have been passing the truck. Contrary to her testimony that she saw the signs depicted in claimants' Exhibits One and Three, Mrs. Hansen said that at this point she had received no indication that she had to be in the right lane if she was to continue eastbound on Interstate 80.

Claimants' Exhibit Six is a photograph of eastbound Interstate 80 taken from a point 750 feet from the cloverleaf. An overhead sign in the distance, which appears to be placed just slightly ahead of the cloverleaf ramp, indicates with an arrow that eastbound traffic must follow the off ramp to the right of the highway. On the

right shoulder of the highway at the point of the overhead sign, there is a sign stating, "Ramp Speed 25." Mrs. Hansen stated that as she neared the ramp for eastbound traffic, she was watching the overhead signs and did not see the sign at the side of the ramp indicating a 25 miles per hour speed on the ramp. She said that she dropped her speed to 55 miles per hour at a point about 400 feet from the ramp, and she said she was moving from the left to the right hand lane because she had noticed the arrow on the overhead sign in claimants' Exhibit Six. She said she was anticipating a junction permitting a 55 miles per hour speed based upon her past experiences on interstate highways.

Claimants' Exhibit Seven is a photograph of eastbound Interstate 80 taken at the cloverleaf ramp. Mrs. Hansen said that at this point she was "really shook up" because she was in the wrong lane, but said that she still never saw the 25 miles per hour sign at the side of the road. She said that at this point, she knew that she was going too fast for the curved ramp and took her foot off the accelerator and put on the brakes, but the car went out of control on the shoulder of the ramp and overturned.

In support of their contention that Interstate 80 was negligently designed and that there was inadequate signing to warn motorists of the sharp cloverleaf for eastbound traffic, claimants presented the testimony of Dr. John W. Hutchinson, a well-qualified expert in the field of highway design and operation.

Dr. Hutchinson testified preliminarily that at a speed of 70 miles per hour, a driver is going 90 feet per second and cannot see a sign for more than six or eight seconds, and thus needs a series of signs to lay out information. He testified that good practice calls for a

sign at least two miles ahead of a junction to tell a driver that another highway is ahead and to give him the name of a major city where it would take him. Next, three quarters of a mile to a mile ahead, the same information should appear on an overhead sign also indicating the lane he needs to get into. Next, from a third of a mile to a half a mile from the junction, a sign should be placed telling the driver that the next right is to a given destination with route or cities indicated. Finally, a sign should be placed in the gore area which says absolutely nothing but "Exit," because it is then too late to give the driver any additional information,

" . . . because if the driver has not learned by the time he gets to the point where the exit actually is that that is where he does or does not want to go—if he hasn't already made up his mind, it is too late to tell him suddently, 'Look, here it is.' You just tell him suddenly, 'That is all.' If you tell him something else, he will make a last minute decision which can be fatal."

Dr. Hutchinson enumerated what he considered to be defects in the designing and signing of the interchange in question. He said that the sign shown in Claimants' Exhibit Four is misleading because it indicates the driver will proceed straight ahead on the route he is on and need not slow more than 10 or 15 miles per hour below the posted speed he is traveling in order to negotiate the diagramatic turn or curve, when the curve requires a reduction of 45 miles per hour from 70 miles per hour to 25 miles per hour. He said that the sign is forbidden by the Illinois Sign Manual on highways such as the one in question, and that because of the very sharp turn ahead, a yellow, diamond-shape warning sign with black lettering, warning of a curve, and an advisory-speed plate posted with the warning sign, were called for by the Illinois Traffic Control Devices Manual.

He further testified, that signing on the highway was not adequate because during the period 1968

through 1971, seventeen accidents (including the one in question) had occurred on the curve going into the ramp:

"From police accident reports I have learned that of 15 or 16 accidents on the ramp, 13 exhibited the same syndrome—turning into the ramp at too high a speed and running off the outside of the curve. These accidents involved various types of vehicles, ages and sexes of drivers, times of day, and weather conditions. This dictates the conclusion that drivers are being tricked into making the turn at too high a speed."

He said that customs and standards in the field of traffic engineering, as well as the Illinois Manual, call for advance speed warnings of 700 feet for a 25 miles per hour advisory speed, while here the first warning is given right at the gore, far too late. He added that there were too many signs at the gore which would confuse drivers. Dr. Hutchinson said that the State failed to mark the deacceleration lane with a standard skip line as provided for in the Illinois Sign Manual and that the design of the junction did not provide route continuity:

"In my opinion the route continuity provided at the site in question does not comply with customary and standard practices in the traffic engineering field. This is because the driver will not expect to go around a curve at 25 MPH through a 270 degree angle in order to proceed straight ahead on an interstate highway which has posted speeds of 70 MPH elsewhere."

He testified that the sight distance of the ramp was inadequate because of the overpass structures hiding the ramp; that it would have been better to use a direct connection design rather than a cloverleaf to avoid the sharp degree of curvature on the ramp; and that a flashing yellow light could have been placed at the gore.

He concluded his direct examination with the statement that nowhere in the United States had he seen an interchange as bad as the one in question, and that in his opinion to a reasonable degree of engineering certainty the design and signing of Interstate 80 did not comply with the customs and standards applicable in the traffic engineering field in 1971.

Mr. David Lutyen, Geometric Designer for the State of Illinois Division of Highways, testified for respondent that in 1971, the traffic count on the ramp was one million six hundred thousand and that there were two reported accidents in 1971 and two reported accidents in 1972. He also testified that the radius of the turn off was standard throughout the State. On cross examination, he acknowledged that a sign distance of 250 feet for a 70 miles per hour traveller when he is required to reduce speed to 25 miles per hour along a curve, is not adequate.

Mr. Donald R. Giese, District Traffice Engineer, acknowledged that the numerals on the 25 miles per hour sign at the gore would only be visible from about 18 feet back. He also testified that in his opinion, a 25 miles per hour speed sign farther back on Interstate 80 would be confusing.

The State is not an insurer of the safety of all persons who travel upon its highways, but it does owe them a duty to utilize reasonable care in the construction and maintenance of roadways under its control. See, *Ervin* v. *State of Illinois*, 25 C.C.R. 256. Claimants bear the burden of proving by a preponderance of the evidence that respondent breached this duty, that claimants were in the exercise of reasonable care for their own safety, and that respondent's negligence was the proximate cause of their injuries.

Claimants contend that respondent was negligent both in designing the interchange of Interstates 80, 280, and 74 and in failing to provide signing adequate to warn motorists of the sharp cloverleaf for eastbound traffic on Interstate 80.

Although it may be that the cloverleaf could have been better planned, and that more warning signs might

have been desirable, we must conclude after a careful consideration of the totality of the record that the proximate causes of the injuries suffered by claimants was Mrs. Hansen's failure to exercise reasonable care at the interchange.

Mrs. Hansen testified that she saw the sign depicted in claimants' Exhibit One advising motorists eastbound on Interstate 80 to use the right hand lane of the highway at a point 4,750 feet west of the cloverleaf ramp. She said she also saw the two signs depicted in claimants' Exhibit Three, places 2,100 feet west of the cloverleaf. One sign again advised eastbound traffic to use the right lane and advised that the junction was one third of a mile ahead. The other sign contained a diagram of the cloverleaf ahead.

These signs clearly indicated a cloverleaf junction one third of a mile ahead and advised that the right hand lane was to be used for Interstate 80 traffic. Yet, Mrs. Hansen ignored these signs and pulled into the left hand lane of traffic to pass a tractor-trailer truck. Consequently, she did not see the additional advisory signs depicted in claimants' Exhibits Four and Five and proceeded in the left hand lane until she reached the gore of the junction when she pulled sharply across the highway and entered the cloverleaf at too a high a speed.

Claimants argue strongly that the sign depicted in claimants' Exhibit Three was inadequate to warn Mrs. Hansen of the extraordinary condition she was about to encounter, but the sign certainly was adequate to advise Mrs. Hansen of a junction one third of a mile ahead and to stay in the right hand lane. We are persuaded that had Mrs. Hansen obeyed that sign, this accident would not have occurred.

Mrs. Hansen's failure to heed the advisory signs posted along Interstate 80, and in particular the signs depicted in claimants' Exhibit Three, is most regrettable. The contributory negligence rule has often been criticized as producing harsh results, but in *Maki* v. *Frelk,* 40 Ill.2d 193, the Illinois Supreme Court reaffirmed the doctrine, and we are bound to apply it here. We must conclude that Mrs. Hansen has not proven either her freedom from contributory negligence or that the negligence of respondent proximately caused the accident, and her claim must therefore be denied.

While the remaining claimants were free of contributory negligence, their claims must also be denied because their injuries were not proximately caused by any act or omission of respondent. In the opinion of this Court, the ultimate reason that the accident occurred was Mrs. Hansen's failure to heed the posted signs advising of the cloverleaf. In *Briske* v. *Village of Burnham,* 379 Ill. 193, at 199, the Court said,

"If a negligent act or omission does nothing more than furnish a condition making an injury possible, and such condition, by the subsequent independent act of a third person, causes an injury, the two acts are not concurrent and the existence of the condition is not the proximate cause of the injury."

This accident was extremely unfortunate and resulted in crippling injuries to Mrs. Hansen. We have accordingly carefully scrutinized the record and applicable precedents and must reluctantly conclude that these claims must be, and hereby are, denied.